IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICKY LEE STUMP, | ) | Case No. 1:19-cv-1719 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Ricky Lee Stump, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Stump's DIB application be affirmed.

**II.    Procedural History**

Stump applied for DIB and SSI on July 30, 2019. (Tr. 200, 207).[1] He alleged that he became disabled on June 1, 2008 due to three herniated discs in his back, type II diabetes, and severe pain and numbness in his right leg. (Tr. 207, 229). The Social Security Administration

---

[1] The administrative transcript is in ECF Doc. 10.

initially denied Stump's applications. (Tr. 106, 113). On reconsideration, the administration granted Stump's SSI claim as of March 2016, but denied his DIB claim again. (Tr. 15). Stump requested an administrative hearing. (Tr. 129). ALJ Peter Beekman heard Stump's case and denied the claim in a July 24, 2018, decision. (Tr. 15-31). On June 2, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On July 30, 2019, Stump filed a complaint challenging the Commissioner's decision. ECF Doc. 1.

**III.    Evidence**

    **A.    Relevant Medical Evidence**

Stump was injured at work on February 20, 2008. (Tr. 464). On February 27, 2008, he went to the emergency room complaining of low back pain. The doctor assessed a lumbar sprain and strain. (Tr. 400). At an examination on March 10, 2008 Stump was able to toe/heel walk; he had some tenderness and increased pain on flexion and extension, lateral right bending, and rotation. He was tender with palpitation to his right flank and his straight leg raise tests were negative. (Tr. 429).

On May 29, 2008, an MRI showed developmental central canal stenosis from L2 through L4; a 5 mm central extrusion of the L3-4 intervertebral disc extending slightly caudal to the L3-4 disc space level and small left lateral disc protrusion; moderately severe central canal stenosis with bilateral neural foraminal narrowing of the exiting L3 nerve root; a 4 mm central extrusion of the L4-5 intervertebral disc extending slightly caudal to the L4-L5 intervertebral disc space level of the right lateral disc protrusion; severe central canal stenosis with moderate right L4-5 neural foraminal narrowing; a small central protrusion of the L2-3 intervertebral disc with a right lateral disc protrusion; mild central canal stenosis with moderate focal attenuation of the thecal sac and mild right neural foraminal narrowing with mild posterolateral displacement of the

exiting right L2 nerve root; and a small broad-based right paracentral protrusion of the L5-S1 intervertebral disc with annular fissuring. (Tr. 412).

Stump returned to the emergency room on June 18, 2008. Examination showed decreased range of motion and muscle spasm in the right lower back area; no motor or sensory deficits; and normal reflexes. (Tr. 425). The physician assessed an acute myofascial strain of the lumbar spine. (Tr. 425). On June 19, 2008, Dr. Louis Keppler noted that Stump's MRI showed lumbar spine stenosis and referred him to pain management for an epidural block. (Tr. 428).

On December 29, 2009, Dr. Satish Mahna examined Stump. Stump ambulated unassisted, but his gait was antalgic. He was in mild distress and weighed 321 pounds. He had weakness in both lower extremities and hypesthesia in the right L1-L2 dermatomes. His reflexes were symmetrically absent and he had positive straight leg raise tests on both sides. (Tr. 542).

On February 23, 2010, Dr. Mahna noted tenderness in the thoracolumbar spine and L3-S1 areas. He had mild to moderate muscle spasms. He also had restricted range of motion, with discomfort, and his neurological exam was unchanged since December 29, 2009. (Tr. 531).

Stump saw pain management specialist, Dr. Bharat Shah, on September 29, 2010. Stump weighed 319 pounds and had bilateral tenderness over L3-S1. His range of motion was decreased and painful in the lumbar spine. Straight leg testing and Patrick's test were within normal limits. Stump reported having difficulty walking. His deep tendon reflexes were reduced at +1 in the lower extremities; his fine motor strength was intact; and his muscle strength was 4/5 in all extremities. (Tr. 453-454). Dr. Shah assessed lumbosacral sprain, lumbar disc displacement/herniation, spinal stenosis of the lumbar region, and unspecified site of sacroiliac region sprain. He prescribed Skelaxin and Mobic and recommended lumbar epidural injections. (Tr. 454).

3

On November 16, 2010, Stump saw Dr. Mahna. He was able to walk into the room unassisted with a right antalgic gait. He had tenderness in the thoracolumbar spine and L3-S1 areas. He had mild to moderate muscle spasm; restricted range of motion with discomfort; and his neurological exam was unchanged since December 29, 2009. (Tr. 496). Stump received three lumbar epidural steroid injections at L4-5 on December 10, 2010, February 17, 2011 and July 7, 2011. (Tr. 457, 459, 461). On October 4, 2011, Stump reported to Dr. Mahna that he was "still about the same." (Tr. 464).

Stump started treating with Dr. Timothy Fetterman on May 10, 2013. He continued to complain of back pain. However, physical examination showed mostly normal results. He had normal range of motion, no edema, no tenderness, normal muscle tone, normal motor skills and reflexes, normal gait and normal coordination. (Tr. 580-581). At an appointment on July 15, 2013, Stump had no new complaints, and his exam returned normal results. (Tr. 576-577). There is little medical evidence from July 2013 until Stump filed his disability application in 2016.

### B. Relevant Opinion Evidence

#### 1. Treating Physician – Dr. Satish Manha

Dr. Manha completed reports related to Stump's Workers' Compensation claim. His final report opined that Stump would be able to return to work in 2011. (See, e.g., Tr. 559).

#### 2. Treating Physician – Dr. Timothy Fetterman

On October 24, 2017, Dr. Timothy Fetterman completed an opinion related to Stump's physical limitations. (Tr. 343). Dr. Fetterman opined that Stump would be able to sit, stand and walk for three to four hours a day; lift 10 pounds occasionally and 5 pounds frequently; and would miss three days of work per month. (Tr. 343).

4

### 3. State Agency Consultants

On August 4, 2016, state agency reviewing consultant, Gerald Klyop, M.D., reviewed Stump's medical records and opined that there was insufficient evidence to determine whether Stump had any severe impairments during the relevant time period. (Tr. 62). On February 3, 2017, state agency reviewing consultant, Rannie Amiri, M.D., reviewed Stump's medical records and agreed that there was insufficient evidence to evaluate the period of June 1, 2008 through March 30, 2014. (Tr. 89).

### C. Relevant Testimonial Evidence

Stump testified at the ALJ hearing. (Tr. 40-48). He was 51 years old at the time of his testimony but was 41 years old when his disability allegedly began. (Tr. 40). He had not gone to high school or gotten his GED. (Tr. 44). He was injured while working for a company that made precast manholes. He had been required to lift manhole covers that weighed approximately 50 pounds. (Tr. 41).

Between 2008 and 2014 (his date last insured), Stump had extreme pain when walking and was only able to walk 300-400 feet. (Tr. 41). He did not use a cane to walk, but wore a back brace. (Tr. 43). He also had pain when sitting and could only sit for about an hour before he needed to stand up and walk around. (Tr. 42). Stump had deep, throbbing leg pain. (Tr. 43). The pain was consistently present and there was not much he could do to relieve it. (Tr. 47). Stump was also diagnosed with diabetes in 2011. (Tr. 46-47).

Vocational Expert ("VE") Darren Wright also testified at the hearing. (Tr. 48-54). The VE testified that an individual who had an eighth grade education and could lift and carry 20 pounds occasionally; could stand and walk four out of eight hours; could sit six out of eight hours- but only for an hour at a time - and would need to stand about every hour to change positions; could occasionally use ramps or stairs, but never ladders, ropes or scaffolds; could

5

frequently balance; could occasionally stoop, kneel, crouch and crawl; had no manipulative limitations, no communicative deficits and no visual deficits; and must avoid dangerous machinery and unprotected heights would not be able to perform Stump's prior work as a precast molder. (Tr. 48-49). However, he would be able to perform the jobs of marker, checker and classifier. If the same individual was further limited to lifting and carrying 10 pounds occasionally and up to 10 pounds frequently; could stand and walk two out of eight hours; and could sit six out of eight hours, he would be able to perform the jobs of sorter, ink printer and table worker. (Tr. 50-51).

If the individual was further limited to less than occasional reaching, there would not be any jobs that he could perform. (Tr. 52-53). Also, no jobs would be available if he missed three days of work on a regular basis. (Tr. 53). The VE testified that most employers will tolerate an employee being off task about 10% of a workday. (Tr. 53).

**IV.     The ALJ Decision**

The ALJ made the following paraphrased findings relevant to this appeal:

5. Stump had the residual functional capacity to perform light work, except that he could lift and carry 20 pounds occasionally and 10 pound frequently; he was able to stand and/or walk for 4 hours, and sit for 6 hours in an 8-hour workday; he needed the option to stand every hour, change positions, sit for an hour at a time, and walk around for an hour at a time throughout the workday; he could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently balance; could occasionally stoop, kneel, crouch, and crawl; and he was required to avoid dangerous machinery and unprotected heights. (Tr. 19).

10. Through the date last insured, and considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Stump could perform. (Tr. 29).

Based on all of his findings, the ALJ determined that Stump was not under a disability through March 31, 2014, the date last insured. (Tr. 30).

6

## V. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

7

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

8

evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Treating Physician Rule[2]

Stump argues that the ALJ failed to follow the treating physician rule by not assigning controlling weight to: 1) the opinions of Dr. Manha that he could not return to work before October 30, 2011 and that he was limited to lifting 10 pounds; and 2) the opinion of Dr. Fetterman that Stump had disabling limitations dating back to, at least, 2008. ECF Doc. 11 at 7-8. At Step Four, the Commissioner must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c). An ALJ must give a treating physician's opinion controlling weight, unless he articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record. *See Biestek*, 880 F.3d at 786 ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). But inconsistency with nontreating or

---

[2] 20 C.F.R. §§ 404.1527 applies to Stump's claim because it was filed before March 27, 2017.

9

nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. §§ 404.1527(c) requires the ALJ to articulate good reasons for the ultimate weight given to a medical opinion). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

10

After summarizing Dr. Manha's numerous opinions that Stump was incapable of returning to his former work, (Tr. 27), the ALJ limited the weight assigned to his opinions as follows:

> I limit the weight to the opinions that address the ultimate issue of disability, because they are reserved to the Commissioner. The medical record does not support limiting the claimant's lifting to only 10 pounds occasionally, that he could only occasionally reach below his knees, or that he has no issues standing and walking frequently. (See examination findings at 13F:13, 17F:8-9 and 12-13, showing back pain, a normal to antalgic gait, none to some reductions in strength and reflexes, and no loss of sensation). The record supports that the claimant has additional limitations in standing and walking and that he is able to lift more than 10 pounds occasionally, as explained above in the residual functional capacity finding. Moreover, he was released by multiple medical providers to return to, at least, light exertion, including lifting 20 pounds during the relevant period. (See weighted portions of the opinions at 11F:3 and 16F:94-95, discussed above). Since only portions of the doctor's opinions are consistent with the evidence of record, I give partial weight to them. (Tr. 27-28).

The ALJ was required to consider Dr. Manha's opinion and, if not assigned controlling weight, explain the weight he *did* assign and provide good reasons for that weight. 20 C.F.R. §§ 404.1527(c). The ALJ's discussion of Dr. Manha's opinions complied with those requirements. He correctly noted that he was not required to accept Dr. Manha's ultimate conclusion that Stump was unable to return to work because that decision was reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d). Then, citing specific supportive treatment notes, the ALJ explained why Dr. Manha's opinions were inconsistent with the record as a whole. For example, he found that Stump was capable of lifting more than 10 pounds during the relevant time period and he cited treatment notes from Dr. Fetterman in 2013 stating that Stump had normal to antalgic gait, none to some reduction in strength and reflexes, and no loss of sensation. (Tr. 27, 576-577, 580-581). Then, the ALJ found that Stump was *more* limited in his ability to stand and/or walk than Dr. Manha's opinion which had marked a box indicating that Stump was capable of frequent

11

standing and walking. (Tr. 558). The ALJ cited records supporting that finding too. Stump has failed to identify any error in how the ALJ weighed Dr. Manha's opinions.

Stump also argues that the ALJ erred in his assessment of Dr. Fetterman's opinion. Dr. Fetterman completed an opinion questionnaire in October 2017, several years after Stump's last insured date. However, Dr. Fetterman's opinion states that the earliest it applied to Stump's symptoms and limitations was 2008. (Tr. 343). After summarizing Dr. Fetterman's opinions, the ALJ stated:

> I give little weight to this opinion because the record does not support that the doctor provided care to the claimant prior to May 10, 2013. (See 17F:12). Moreover, the doctor's own examination findings do not support the degree of limitations on lifting, use of upper extremities, absenteeism, and environmental factors to which he opined. For example, at exam on May 10, 2013, the claimant was normal throughout, including normal range of motion, no edema, no tenderness, normal muscle tone, normal motor skills and reflexes, normal gait, and normal coordination. (17F:12-13; and see also exam on July 15, 2013 (17F:8-9)). As to his opinion regarding medication side effects, the claimant denied medication side effects consistently throughout the record. (See e.g., 4F:1, 4, 6 and 8; 10F:2, 10, 12, 14, and 17; and 17F:3). Moreover, these opinions were rendered more than three years after the relevant period. The record supports limiting the claimant to light exertion, with some restrictions on standing, walking, climbing, postural activities and exposure to hazards, as discussed above. (See examination findings at 13F:13, 17F:8-9 and 12-13, showing back pain, a normal to antalgic gait, none to some reductions in strength and reflexes, and no loss of sensation.) Otherwise, the doctor's opinion lacks consistency with his own treatment notes. Based on these reasons, I give partial weight to these opinions.

The ALJ was required to consider Dr. Fetterman's opinion and, if he chose not to assign controlling weight, then to explain the weight he *did* assign and provide good reasons for that weight. 20 C.F.R. §§ 404.1527(c). And again, he did just that. Dr. Fetterman said that his opinions about Stump's impairments existed as early as 2008, but he did not start treating Stump until 2013. And having reviewed Dr. Fetterman's treatment notes from 2013, the ALJ found that they did not support his 2017 opinion. The ALJ cited specific records supporting this finding. In short, Stump has failed to identify any error in the ALJ's evaluation of Dr. Fetterman's opinions.

Stump complains that, after assigning less than controlling weight to Dr. Fetterman's opinions, the ALJ did not go through each of the 20 C.F.R. §§ 404.1527(c)(2)-(6) factors: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, etc. ECF Doc. 11 at 10. But, nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). Moreover, the ALJ expressly evaluated several of these factors. He noted that Dr. Fetterman's opinion was rendered more than three years after the relevant time period and that he didn't start treating Stump until 2013. (Tr. 24-25) He also cited some of Dr. Fetterman's treatment notes during the relevant time period (before the last insured date of March 31, 2014) that were inconsistent with his 2017 opinion. (Tr. 24-25). The ALJ was not required to discuss each factor from 20 C.F.R. §§ 404.1527(c)(2)-(6), and the factors he *did* discuss provided sufficient support for his decision to assign little weight to Dr. Fetterman's opinion.

Stump argues that the ALJ did not conduct a fact-based analysis of Dr. Manha's and Dr. Fetterman's opinions but, instead, undercut them by stating that Stump had been "released by multiple medical providers to return to, at least, light exertion." ECF Doc. 11 at 8. He then argues that the "multiple providers" referred to in the decision included a work state sheet from February 27, 2018 and another form dated March 18, 2018. *Id.* He argues that these forms represented "wishful thinking" within days of Stump's original injury and should not be been relied upon by the ALJ.

13

The ALJ mentioned that multiple providers had released Stump to work when he explained the weight assigned to Dr. Manha's opinions. (Tr. 27-28). These "return-to-work" opinions were relevant to his analysis of Dr. Manha's opinions which were, in large part, basic estimates of when Stump could return to work. Dr. Manha continually updated his opinion based on Stump's evolving condition. For example, in March 2010, Dr. Manha estimated that Stump could return to work on April 30, 2010. (Tr. 555). However, he modified his opinion numerous times, and his last opinion stated that Stump could return to work on October 31, 2011. (Tr. 558).

The ALJ identified two other records that expressed different estimates of Stump's return-to-work date. The first record was from February 27, 2008, a week after Stump was injured. This record stated that Stump could return to work the next day if he was assigned to modified duty. (Tr. 401). And Stump did, in fact, return to work and was assigned to light duty until June 2008 when he re-injured his back. (Tr. 47). The second record was from March 31, 2008 and appears to be a form similar to the ones completed by Dr. Manha but was completed by a different medical provider. (Tr. 556-557). This doctor opined that Stump should limit his lifting to less than 25 pounds. The ALJ was correct that these records were from the relevant time period (2008 to 2014), but they added little to his analysis of Dr. Manha's opinions because those opinions covered a later time period (2010-2011) and were rendered after Stump reinjured his back at work.

If these two records were the *only* support for the ALJ's decision to assign little weight to Dr. Manha's opinions, Stump's argument would be much stronger. However, the ALJ did not rely on these records alone in his evaluation of Dr. Manha's opinions. As already noted, the ALJ correctly found that he was not required to accept Dr. Manha's ultimate conclusion that Stump was unable to return to work. And as already explained, the ALJ cited specific treatment notes

14

when explaining his finding that Dr. Manha's opinions were inconsistent with the record as a whole. The ALJ's statement that Stump had been released to work by multiple medical providers, while technically correct, did not provide much of the basis for the ALJ's decision to assign little weight to Dr. Manha's opinions. Nevertheless, because the ALJ properly supported this decision with *other* evidence from the record and applied the correct legal standards, Stump has failed to identify any error in the ALJ's evaluation of Dr. Manha's opinions.

Stump argues that the ALJ's decision was internally contradictory in its evaluation of a doctor's "return-to-work" form/opinion from March 31, 2008. ECF Doc. 11 at 9; (Tr. 556-557). Regarding this opinion, the ALJ stated:

> I give partial weight to the unidentified doctor who completed a form dated March 31, 2008, indicating the claimant was limited to lifting less than 25 pounds and no squatting and stooping, and that he could return to work on February 23, 2008 and February 28, 2008. (16F:94-95). The criteria for evaluating medical opinions are set forth in 20 CFR 404.1527. These sections state, among other things, that generally more weight is given to the opinions of treating sources because they are likely to be most able to provide a detailed, longitudinal picture of the claimant's impairments. However, if it is found that a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other evidence of record, it will not be given controlling weight. I give partial weight to the opinion because while the acute exacerbation of back pain the claimant encountered supports reducing him to light exertion, the record does not support limiting the claimant from all squatting and stooping, as explained above in the residual functional capacity finding. The opinion does not address other areas of physical functioning necessary to evaluate the claimant's residual functional capacity. Based on the incomplete nature of the opinion and the fact that portions of the opinion are supported by the evidence of record, I give partial weight to this opinion.

Stump complains that the ALJ only assigned "little weight" to this opinion, but then used it to support his decision to assign little weight to Dr. Manha's opinions. The ALJ assigned "partial weight" to this opinion, explaining that the record did not support the opinion that Stump was incapable of any squatting or stooping, but *did* support the opinion that he was able to lift less than 25 pounds. As already stated, this opinion added little support to the ALJ's evaluation of

15

Dr. Manha's opinions. These form opinions, like those that Dr. Manha completed, were frequently modified as Stump's injury from his work-related accident was evaluated and his records were updated. It was not improper for the ALJ to consider and evaluate the March 31, 2008 opinion even if it was but a small part of the overall medical record. Had the ALJ not considered that opinion, he would have been out of compliance with agency regulations. And even if we were to agree with Stump that the ALJ's consideration of this March 2008 opinion was somewhat contradictory, it does not appear that it had any great impact on the ALJ's decision. The ALJ did not rely heavily on this opinion in either his evaluation of Dr. Manha's opinions or his RFC determination, both of which were supported by other substantial evidence from the record. Contrary to Stump's argument, the February and March 2008 forms/opinions were not the only evidence in the record that was inconsistent with the opinions of Dr. Manha and Dr. Fetterman. Thus, any alleged error in the ALJ's handling of the March 2008 opinion was harmless at worst.

 Stump argues that "the only reason" offered by the ALJ to discount the treating physicians' opinions are two forms from February 2008. ECF Doc. 11 at 11. Stump argues that these forms were completed shortly after his work place injury and represented an optimistic view that Stump would be able to return to work sooner than he did. As already stated, if the ALJ had only relied on these 2008 forms, Stump's argument would be more convincing. However, as has already been explained above, Stump's contention is not accurate. The ALJ did not discount the opinions of Dr. Manha and Dr. Fetterman based, solely, on forms from 2008 or a one-time consultative examination by the unidentified physician who completed the March 31, 2008 form. (Tr. 24-28). Instead, he discounted Dr. Mahna and Dr. Fetterman's opinions based on his review of the entire record, just as he was required to do.

16

Stump argues that there was ample evidence opinion and otherwise to show that he was disabled prior to his date last insured. ECF Doc. 11 at 7. However, he has not cited any of the evidence to which he refers. Moreover, his desire for the evidence to be weighed differently to support a different outcome, does not mean that the ALJ's decision lacked the support of substantial evidence. The ALJ properly summarized the record evidence and cited support for his findings. He did not err in his evaluation of the medical source opinions or the other record evidence. Because the ALJ's decision was within his "zone of choice," I recommend that it be affirmed. *Mullen,* 800 F.2d at 545.

### C. RFC and Burden at Step Five

In his introductory paragraph, Stump argues that the ALJ erred by determining that Stump needed to be able to walk around for an hour during work hours, but then finding that Stump was capable of performing jobs that were performed in a stationary manner only and did not include this limitation. ECF Doc. 11 at 1. This argument is not fully developed in Stump's brief. Nor did Stump file a reply brief. Nevertheless, I will briefly address this argument.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See Id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question

17

accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

      Here, the ALJ asked the VE to consider an individual who would need to change positions and walk around after sitting or standing for an hour. (Tr. 49). The VE testified that this individual would be capable of performing the jobs of marker, checker and classifier. (Tr. 50). This testimony was substantial evidence supporting the ALJ's finding that there were a significant number of jobs that someone with Stump's RFC could perform.

      The Commissioner argues that Stump waived his argument regarding the stationary nature of the jobs identified by the VE. He cites case law holding that that such an argument is waived if the plaintiff does not challenge the validity of the VE's identified jobs at the hearing. ECF Doc. 13 at 12; *Zimmerman v. Comm'r of Soc. Sec.,* 2019 U.S. Dist. LEXIS 167019 at * 16 (N.D. Ohio, September 27, 2019) (citing *Ledford v. Astrue,* 311 F. App'x 746, 757, 2008 U.S. App. LEXIS 25989 (6th Cir. 2008)).

      The court has reviewed the transcript of the oral hearing and agrees with the Commissioner that Stump's attorney did not challenge the VE's opinion testimony regarding the jobs that Stump could perform. He clarified the sitting and standing option incorporated into Stump's RFC, but he did not ask any questions about whether that requirement would impact the jobs identified by the VE that Stump could still do. (Tr. 51-52). Because Stump did not fully

18

develop this argument, did not raise it during the administrative hearing, and did not file any reply arguing that it had not been waived, I find that he waived this argument. The VE's testimony was substantial evidence that someone with Stump's RFC could perform a significant number of jobs in the national economy.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court affirm the Commissioner's final decision denying Stump's application for DIB.

Dated: August 4, 2020

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).